**[Cite as *State v. Grim*, 2023-Ohio-4474.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

**STATE OF OHIO,**                                                   **CASE NO. 8-23-01**

    **PLAINTIFF-APPELLEE,**

    **v.**

**ETHAN C. GRIM,**                                                   **O P I N I O N**

    **DEFENDANT-APPELLANT.**

**Appeal from Logan County Common Pleas Court**
**Trial Court No. CR 21 07 0172**

**Judgment Affirmed**

**Date of Decision:  December 11, 2023**

**APPEARANCES:**

    *William T. Cramer* **for Appellant**

    *Eric C. Stewart* **for Appellee**

**WALDICK, J.**

{¶1} Defendant-appellant, Ethan Grim ("Grim"), brings this appeal from the January 25, 2023, judgment of the Logan County Common Pleas Court sentencing him to prison after Grim was convicted by a jury of two counts of Complicity to Murder, Complicity to Aggravated Burglary, Complicity to Aggravated Robbery, and two counts of Complicity to Felonious Assault.[1] On appeal, Grim argues that he was denied Due Process and his rights under the Confrontation Clause when a detective was permitted to testify regarding statements made by Grim's codefendants at Grim's juvenile probable cause hearing. Grim also argues that his convictions were against the manifest weight of the evidence, that certain evidence was improperly admitted at his trial, and that the trial court improperly considered evidence outside the record when sentencing Grim. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{¶2} On November 27th, 2019, four individuals conspired to steal from a drug dealer in Bellefontaine. Three of the four individuals unlawfully entered the drug dealer's residence while the fourth individual waited in the car outside. During the home invasion, multiple residents were assaulted and two residents were shot in the head and killed.

---

[1] In addition, the jury convicted Grim of Complicity to Kidnapping, but that charge was merged for purposes of sentencing. Further, all charges contained firearm specifications.

**{¶3}** One of the home-invaders, Elijah Barrett ("Barrett"), was shot in the leg during the incident and he was taken to a hospital in Urbana. Barrett ultimately confessed and named his three accomplices: Ethan Grim ("Grim"), Austin Allen ("Allen"), and Josia Bush ("Bush"). Allen, the driver who waited outside during the home invasion, also confessed to his role and implicated Grim, Bush, and Barrett as well.

**{¶4}** Grim was less than a month shy of his 18th birthday when the crimes were committed. Barrett and Bush were also juveniles but Allen, the driver, was an adult.

**{¶5}** A delinquency complaint was filed against Grim charging him with, *inter alia*, Complicity to Aggravated Burglary and Complicity to Murder. On December 30, 2019, the State filed a motion to relinquish jurisdiction over Grim seeking a discretionary bindover pursuant to R.C. 2152.12(B).

**{¶6}** Over objection from Grim, the juvenile court held a joint probable cause hearing for all three juveniles. The juvenile court ultimately determined that there was probable cause to believe that Grim and the two others committed the charged acts.

**{¶7}** On June 1, 2021, an amenability hearing was held on the State's motion to relinquish jurisdiction.[2] After hearing the testimony presented and reviewing the

---

[2] Prior to the hearing, a social history investigation and a forensic psychological evaluation of Grim were conducted.

submitted evaluation, the juvenile court determined that the factors in favor of transfer outweighed the factors against transfer, that Grim was not amenable to rehabilitation in the juvenile system, and that the safety of the community required that Grim be subject to adult sanctions. The juvenile court granted the State's motion to relinquish jurisdiction and bound Grim over to the Logan County Common Pleas Court.

{¶8} On July 13, 2021, Grim was indicted for Complicity to Aggravated Burglary in violation of R.C. 2911.11(A)(1) and R.C. 2923.03, a first degree felony (Count 1), Complicity to Aggravated Robbery in violation of R.C. 2911.01(A)(3) and R.C. 2923.03, a first degree felony (Count 2), Complicity to Kidnapping in violation of R.C. 2905.01(A)(2) and R.C. 2923.02, a first degree felony (Count 3), two counts of Complicity to Felonious Assault in violation of R.C. 2903.11(A)(2) and R.C. 2923.03, both second degree felonies (Counts 4 and 5), and two counts of Complicity to Murder in violation of R.C. 2903.02(B) and R.C. 2923.03, both unclassified felonies (Counts 6 and 7). All seven counts in the indictment contained three-year firearm specifications pursuant to R.C. 2941.145(A). Grim pled not guilty to the charges.

{¶9} Grim proceeded to a jury trial from January 9-12, 2023. At the conclusion of the trial, the jury found Grim guilty of all counts in the indictment and specifications. On January 25, 2023, Grim was sentenced to serve an aggregate, indefinite prison term of 50 years to life, with parole eligibility after 25 years. Grim

now appeals his convictions and sentence, asserting the following assignments of error for our review.

**First Assignment of Error**

**Appellant's rights to due process under the state and federal constitutions were violated when the juvenile court denied appellant the ability to confront and cross-examine his accusers.**

**Second Assignment of Error**

**Appellant's convictions were not supported by the weight of the evidence.**

**Third Assignment of Error**

**The trial court abused its discretion in admitting hearsay evidence from a non-testifying co-defendant.**

**Fourth Assignment of Error**

**The trial court abused its discretion in admitting an out-of-court statement to explain the conduct of an accomplice.**

**Fifth Assignment of Error**

**The trial court erred by crafting a sentence based on testimony from a codefendant's separate trial that was not in the record in this case.**

*First Assignment of Error*

{¶10} In his first assignment of error, Grim argues that his Due Process rights, and his rights under the Confrontation Clause, were violated when one of the State's witnesses was permitted to testify regarding statements elicited from Grim's codefendants at the probable cause hearing in juvenile court.

Standard of Review

**{¶11}** Generally, the admission of evidence lies within the broad discretion of the trial court. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62. However, we conduct a de novo review of hearsay evidentiary rulings that implicate the confrontation clause. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97.

Analysis

**{¶12}** In determining the State's motion for discretionary bindover in this matter, the juvenile court held a joint probable cause hearing for Grim, Bush, and Barrett. At the hearing, the State presented the testimony of eight witnesses, one of whom was a detective with the Bellefontaine Police Department. The detective testified to statements made to him by Barrett and Allen that implicated Grim in the crimes.

**{¶13}** Objections were made to the detective relaying out-of-court statements made by Barrett and Allen. Attorneys for the juveniles argued that since Barrett and Allen were not testifying, the evidence was in violation of the Confrontation Clause. The State responded that in a probable cause hearing, rather than a trial, there were relaxed evidentiary standards and the Confrontation Clause did not apply. The trial court agreed and permitted the detective to testify regarding Barrett and Allen's statements to police.

**{¶14}** Grim now renews his argument on appeal, contending that the detective's testimony recounting statements made by Grim's codefendants was in violation of the Confrontation Clause. However, Grim does acknowledge in his brief that Ohio Appellate Districts have repeatedly declined to apply the Confrontation Clause and strict hearsay rules to juvenile probable cause hearings. The Twelfth District Court of Appeals recently addressed the issue as follows:

> The United States Supreme Court has explained that "[t]he right to confrontation is basically a trial right." *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). A juvenile transfer hearing "is not a trial as it does not 'find as a fact that the accused minor is guilty of the offense charged. It simply finds the existence of probable cause to so believe.' " *State v. Garner*, 6th Dist. Lucas No. L-18-1269, 2020-Ohio-4939, ¶ 19, quoting *State v. Iacona*, 93 Ohio St.3d 83, 93 (2001).
>
> The United States Supreme Court "has repeatedly declined to require the use of adversarial procedures to make probable cause determinations." *Kaley v. United States*, 571 U.S. 320, 338, 134 S.Ct. 1090, 188 L.Ed.2d 46 (2014). The federal courts have repeatedly held that the Sixth Amendment's Confrontation Clause does not apply to preliminary hearings.[4] Likewise, the Ohio Supreme Court has held that the constitutional right to confront one's accusers "relates to the *actual trial* for the commission of the offense and not to the preliminary examination * * *." (Emphasis added.) *Henderson v. Maxwell*, 176 Ohio St. 187, 188, 198 N.E.2d 456 (1964).

*State v. Fuell*, 12th Dist. Clermont No. CA2020-02-008, 2021-Ohio-1627, ¶ 29-30, appeal allowed, 164 Ohio St.3d 1419, 2021-Ohio-2923, and appeal dismissed as improvidently allowed, 168 Ohio St.3d 631, 2022-Ohio-1607.

**{¶15}** Similar to the appellant in *Fuell*, Grim cannot cite a single Ohio case determining that the Confrontation Clause applies at juvenile transfer/probable

cause hearings, or that a detective's "hearsay" testimony at a juvenile probable cause hearing creates a Due Process issue. *Id.* at ¶ 32. In fact, contrary to Grim's unsupported claim on appeal, other Ohio Appellate Courts have made similar findings to *Fuell*. *See In re B.w.*, 7th Dist. Mahoning No. 17 MA 0071, 2017-Ohio-9220, ¶ 48 (going so far as to state a juvenile court *erred by not considering incriminating statements made to a detective from another source in a juvenile bindover proceeding*); *State v. Powell*, 4th Dist. Gallia No. 20CA3, 2021-Ohio-200, ¶ 23; *State v. LaRosa*, 11th Dist. Trumbull No. 2018-T-0097, 2020-Ohio-160, ¶ 38-39; *State v. Garner*, 6th Dist. Lucas No. L-18-1269, 2020-Ohio-4939; *State v. Dell*, 5th Dist. Licking No. 2021CA00079, 2022-Ohio-2483.

{¶16} After reviewing the applicable legal authority, we agree with the other Ohio Appellate Districts, and the statements from the Supreme Court of the United States, that confrontation is essentially a "trial right." As the probable cause hearing here did not constitute a trial, the Confrontation Clause does not warrant reversal. Similarly, we find no Due Process violation here because Grim was afforded all proper procedures in the juvenile proceedings pursuant to statute. Therefore, Grim's first assignment of error is overruled.

*Second Assignment of Error*

{¶17} In his second assignment of error, Grim argues that his convictions were against the manifest weight of the evidence. Grim contends that while the acts

in question were committed by *someone*, the evidence did not establish that he was one of the culprits beyond a reasonable doubt.

### Standard of Review

**{¶18}** In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, this court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*.

**{¶19}** Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

### Evidence Presented

**{¶20}** On November 27, 2019, the night before Thanksgiving, there were seven people living at 601 West Columbus in Bellefontaine: six adults and one

juvenile. Anthony Scartz ("Ant") was one of those adults, and he was known to sell marijuana out of the residence.

{¶21} At approximately 11:30 p.m., four of the seven residents of 601 West Columbus were home—two of them having recently returned. At that time, the three other residents of 601 West Columbus, including Ant, were traveling back to the residence together as they returned from Wal-Mart.

{¶22} In the minutes after 11:30 p.m., three individuals wearing masks/bandanas and/or hoods to hide their faces, and gloves on their hands, entered the residence through the front door. The lead individual, Barrett, according to his testimony, was carrying an orange firearm. Barrett told Ant's girlfriend Kayla, who was on the living room couch, not to move, then Barrett followed Ant's mother into the ground-floor bathroom, struck her in the head with the orange firearm, and placed her in the bathtub.

{¶23} Kayla was subsequently taken upstairs. One resident was sleeping in an upstairs bedroom and she was also struck in the head by Barrett with the orange pistol. Kayla yelled "stop," and Barrett threatened to "blow [her] fucking head off." (Tr. at 216).

{¶24} The home-invaders then repeatedly asked Kayla "where's the money?" She took them to the room she shared with Ant, opened the safe and showed them that there was no money in it. However, Kayla did see one of the individuals reach down and grab something in the room.

{¶25} As the home-invaders were upstairs, Ant, his friend Caleb, and his friend Jada returned home together from Wal-Mart. Ant grabbed his pistol and fired upstairs at one of the home-invaders. One shot struck Barrett in the leg. Barrett fired his gun at Ant and striking Ant in the head. Ant would eventually die from the wound.

{¶26} Because he was shot by Ant, some of Barrett's blood was smeared on the wall upstairs. Barrett testified that after he was shot he handed the orange firearm to one of the others and he was helped downstairs. When the three home-invaders got downstairs, Barrett testified that Grim grabbed Ant's gun off the ground and they moved to leave. According to Barrett, around that time, Caleb struck Grim in the back with what Barrett thought was a machete, but turned out to be an "asp" or "baton." According to Barrett, Grim turned around and shot Caleb in the head, killing him. The three home-invaders then left the residence.

{¶27} After stopping for gas, Barrett was left outside a hospital in Urbana. He was ultimately care-flighted to Nationwide Children's Hospital in Columbus to be treated for his gunshot wound. While there, he spoke with police. Initially he told police he was shot in a drive-by shooting, but when confronted with his blood found at the scene of the shooting, he changed his story, saying that he was shot in a crossfire at Ant's residence while trying to buy marijuana. Later, he told the police his entire story, indicating that he, Grim, Bush, and Allen had intended to steal from

Ant. He testified that Allen was the driver and waited in the car while the three juveniles went inside.

{¶28} Barrett testified that for his role in the incident he had pled guilty to Complicity to Felonious Assault, Complicity to Aggravated Robbery, and Complicity to Murder, and that at the time of Grim's trial he had already testified in Bush's trial. Barrett was only fifteen years old when the murders were committed.

{¶29} Allen spoke with police and also initially tried to minimize his role, stating that the original plan was to purchase marijuana from Ant with counterfeit money. However, he later told police a version of events that largely corroborated Barrett's, though Allen did not know exactly what occurred inside the residence since he was in the car. Allen testified that the three individuals who went into the house were Grim, Bush, and Barrett.

{¶30} The evidence indicated that Grim and Bush were cousins, and they were both interviewed by police the day after the incident. Bush confessed to the police, but when Grim was confronted with the incident Grim said he did not know what the officers were talking about. Nevertheless, Grim and Bush were transported to a holding facility together, and in the back of the police cruiser Bush told Grim that they talked to the "driver" and "they got us on camera." (Tr. at 563). Grim said "they" did not have anything and to not talk to the police. (*Id.*)

{¶31} Notably, the State presented evidence that after Grim was interviewed, he had an injury to his back where Barrett said Grim had been struck. That injury was photographed and entered into evidence.

{¶32} The State presented the testimony of numerous other witnesses, some of whom placed Grim, Bush, Barrett, and Allen together in Bellefontaine in the hours before the event in question, such as Mason Fox. Allen had testified that he used Mason's car and Mason actually planned the robbery. Mason denied planning the incident, and testified that Barrett, Grim, and Bush were excited at his house about committing a robbery earlier on the evening in question. Testimony indicated that Allen had gone to Urbana with Barrett to pick up Grim and Bush earlier on the date of the incident using Mason Fox's vehicle.

{¶33} The orange firearm that was brought to 601 West Columbus and the firearm that was taken from Ant were never found. Barrett also testified that the orange firearm that he used came from Grim, and that Grim had received it from his brother. The State presented evidence, over objection, that Grim's older brother at one point had sent a text message with a picture of an orange firearm and a statement that he intended to give it to "little bro." (Tr. at 448).

{¶34} Grim's older brother testified on behalf of the defense that he never gave Grim a firearm and that when he referred to "little bro" in the text message he was talking about a tattoo client, not his younger brother. Grim's older brother was incarcerated at the time of Grim's trial. He denied lying for his brother and he said

he was not aware of anything bad happening to people who cooperated with authorities.

Analysis

{¶35} Grim argues that all of his convictions are against the manifest weight of the evidence, contending that the evidence "tying" him to the crimes was circumstantial and equivocal. Grim contends that his DNA and fingerprints were not found at the scene. He also argues that the evidence established that Barrett, Bush and Allen were the individuals who were actually in the house, not Grim, because some of the witnesses in the house indicated that one of the perpetrators had "light colored eyes" and Allen was the only one with blue eyes.

{¶36} Further, Grim contends that Barrett and Allen were not credible given their repeated attempts to minimize their involvement. Finally, he argues that the fourth person was more likely Mason Fox than Grim given that it was Fox's car that was driven to and from the scene, and given that Fox was purportedly the mastermind behind the robbery according to Allen.

{¶37} In addressing Grim's arguments that the evidence did not support that he was one of the people who perpetrated the indicted crimes, we first emphasize that two of his cocomplicitors testified that Grim was directly involved in the home invasion. Barrett specifically testified that Grim was the person who shot Caleb in the head after Caleb struck Grim in the back with a baton.

{¶38} Notably, the jury was instructed that an accomplice's testimony should be viewed with grave suspicion and weighed with great caution. Nevertheless, the jury evidently found Allen and Barrett credible, and that credibility determination can be supported by numerous pieces of evidence.

{¶39} For example, the injury to Grim's back on the day after the incident was consistent with Barrett's testimony. In addition evidence placed the four individuals together in the hours before the murder. Further, Grim was specifically tied to the uniquely orange firearm, which was observed by multiple people as being used in this case. Moreover, a jury could readily determine that it was not believable that Grim and his cousin Bush, who were picked up together in Urbana on the day of the shooting, would have been separated for this one incident that day.

{¶40} Thus evidence was presented to corroborate portions of the stories told by Allen and Barrett, so the jury did not have to rely on their testimony alone. Nevertheless, we emphasize that Allen and Barrett had already pled guilty to numerous crimes for their roles in the November 27, 2019 incident. Barrett even readily admitted to shooting Ant and striking multiple people with the firearm, seeming not to minimize his conduct at all during Grim's trial.

{¶41} While we note that there was some conflicting testimony indicating that one of the home-invaders may have had blue or light-colored eyes, and Grim evidently did not have blue eyes, this does not prevent Grim from being one of the assailants in this matter, particularly given the lack of certainty from the witnesses

about eye color. Further, as to Grim's assertion that Mason Fox was more likely one of the individuals involved than him, Fox also testified at trial and the jury was able to evaluate his credibility as well.

{¶42} In sum, based on the evidence presented, we do not find that this is one of the exceptional cases where the evidence weighs heavily against the convictions, which is required for reversal. *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9. The direct and circumstantial evidence is simply overwhelming in establishing Grim as one of the perpetrators in these crimes. Therefore Grim's argument that his convictions were against the manifest weight of the evidence due to the State's purported failure to establish his identity as a perpetrator beyond a reasonable doubt are not well-taken.[3] His second assignment of error is overruled.

*Third Assignment of Error*

{¶43} In his third assignment of error, Grim argues that the trial court improperly admitted hearsay evidence at trial from a non-testifying codefendant.

Standard of Review

{¶44} As stated previously, a trial court's evidentiary rulings are generally reviewed under an abuse of discretion standard. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97. An abuse of discretion is a decision by the trial court

---

[3] Grim's brief neither mentions nor challenges any of the remaining elements of the crimes against him. Nevertheless, even if he did, the record supports the convictions.

that is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

Analysis

{¶45} On November 29, 2019, Bush and Grim were brought to JDC and a nurse conducted a medical evaluation of them. The nurse testified at trial that when she was putting the blood-pressure cuff on Bush's arm, she noticed that Bush had some "open nicks" on his arm. (Tr. at 452). The nurse asked Bush if he shaved his arms and Bush responded that he did because he was "shaving the residue off." (*Id.* at 453). The nurse contacted law enforcement and passed the information along. A detective testified at trial that Grim also had shaved arms when he was interviewed.

{¶46} Grim's attorney objected to the statements of Bush "shaving the residue off" being brought in through the JDC nurse, and the trial court overruled the objection finding that the statement "was done for purposes of medical diagnosis," thus fitting a hearsay exception. (*Id.* at 452). Grim renews his argument on appeal, contending that the trial court erred because removing "residue" was not reasonably pertinent to diagnosis or treatment under Evid.R. 803(4).

{¶47} The State counters by reasserting that the nurse was asking Bush about the cuts on his arms for purposes of medical diagnosis under Evid.R. 803(4). In addition, the State argues that the "shaved arms" issue does not go directly to the truth of the matter asserted.

**{¶48}** We note that we do not agree with the State's argument that the evidence does not go to the truth of the matter asserted as the shaved arms for purposes of removing "residue" constitutes circumstantial evidence to establish identity of the perpetrators. However, as the trial court indicated, there could be some medical purpose for asking a juvenile why he has cuts on his arms when conducting a medical evaluation, such as ensuring the cuts were not self-inflicted. Therefore the trial court's ruling that the hearsay exception for medical diagnosis was applicable was not unreasonable or arbitrary.

**{¶49}** Nevertheless, even if we determined that the testimony that went beyond Bush shaving his arms to his statement that he wanted to get the "residue off" was inadmissible hearsay, we still find that the remaining evidence overwhelmingly supports the convictions beyond a reasonable doubt, thus the error would be harmless because it is so inconsequential compared to the remaining compelling evidence. *See State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061 (setting forth harmless error parameters in situations where evidence was erroneously admitted). For these reasons, Grim's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶50}** In his fourth assignment of error, Grim argues that the trial court improperly permitted Allen to testify regarding a phone conversation he overheard Grim having with Grim's older brother after Barrett had been dropped off at the hospital. Grim argues that the testimony constituted inadmissible hearsay, and that it was extremely prejudicial.

Analysis[4]

**{¶51}** When Allen, the driver, was testifying on direct examination, the following exchange occurred:

Q. So you dropped [Barrett] off at the hospital. You didn't drive up to the emergency room doors, did you?

A. No.

Q. Where did you drop him off at?

A. Like I said, there's a side street behind Mercy Health, and so we pulled up to the stop sign, [Barrett] got out there.

Q. And he walked up to the hospital?

A. Yeah

Q. Okay. So then what happens? What – you and [Grim] and [Bush] are still in the car. What happens?

A. So, we take that stop sign, we turn right, and we come down and then we turn left and we get in some suburban neighborhood. I don't know where we're at. I don't know Urbana very well. [Grim's] on the phone with I'm going to assume it was his brother, it was Sway. He

---

[4] The same standard of review applied in the third assignment of error is applicable here.

gets on the phone and his brother asked him, he said, do you trust him with a life sentence?

[DEFENSE COUNSEL]: Objection.

THE WITNESS: He said no.

THE COURT: Hang on one second.

[PROSECUTOR]: So, this doesn't go to the truth of the matter asserted, it just goes to show what happens in the next order of events here.

THE COURT: Okay. [Defense Counsel], do you have – do you want to add to that?

[DEFENSE COUNSEL]: Normally that's used when it's a police officer in an investigation. I don't think that applies to a lay witness.

THE COURT: I think it applies. Ladies and gentleman of the jury, again, what Mr. Allen tells you the person on the other end of the phone named Sway said is not being offered for the truth of the matter of what Sway said, it's being offered to show how Mr. Allen acted in a particular manner in response to that rather than prove the matter of proof of what the other person, Mr. Sway said. So you're not to consider the truth of the matter of what Mr. Sway said, just consider the testimony about this as to [the] effect it had on Mr. Allen. You may proceed, [prosecutor].

Q. So what did you overhear?

A. So, I overheard – the radio was off in the car and that car ran [sic] was a quiet car, so, [Grim's] on the phone with Sway and he said do you trust him with a life sentence. [Grim] said no. He [Sway] said then you know what to do.

Q. So what did you do?

A. Next opportunity I got, as soon as I pulled the car over, I put it in park and I jumped out and said I got to pee. So I go behind this fenced-

in area, and I overheard [Grim] tell Bush You ready to do this? So I just took off.

(Tr. at 532-534).

**{¶52}** Grim contends that the trial court erred by permitting Allen to testify regarding what Allen overheard during Grim's phone conversation. He argues that Allen's conduct in running away was not relevant to the guilt on the charged offenses and it did not need to be explained. He argues that because the testimony suggested that Grim would have potentially killed Allen, it was highly prejudicial hearsay and should have been excluded.

**{¶53}** Even if we assumed, without finding, that Grim was correct that the evidence should have been excluded, the trial court minimized any impact of the statements by providing an *immediate* limiting instruction, telling the jury that "Sway's" statements were only to be considered for purposes of why Allen got out of his vehicle. A jury is presumed to follow curative instructions. *State v. Garner*, 74 Ohio St.3d 49, 1995-Ohio-168.

**{¶54}** Moreover, we emphasize that the most damning statement that occurred in the cited segment was categorically not hearsay, which was when Allen testified to Grim asking Bush if he was "ready to do this?" Evid.R. 801(D)(2). Any statement made by Grim's brother on the phone carries little impact if Grim does not make his own statement indicating that he may act on it.

**{¶55}** Finally, the erroneous admission of hearsay is subject to harmless error analysis. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 64. Pursuant to Crim.R. 52(A), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." In order to determine whether substantial rights were affected, we must determine whether there was prejudice, whether the error was harmless beyond a reasonable doubt, and whether the remaining evidence provides overwhelming evidence of guilt. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 25-31.

**{¶56}** Here, we unequivocally find that any purported error was harmless beyond a reasonable doubt. Any prejudice was minimized by the trial court's instruction, and the remaining evidence provides overwhelming evidence of guilt. Furthermore, the direct and circumstantial evidence tying Grim to the crimes is overwhelming beyond a reasonable doubt establishing Grim's guilt. For these reasons, Grim's fourth assignment of error is overruled.

*Fifth Assignment of Error*

**{¶57}** In his fifth assignment of error, Grim argues that the trial court erred by crafting a sentence based on testimony from a codefendant's separate trial, which was not included in the record in this case.

Standard of Review

**{¶58}** Under R.C. 2953.08(G)(2), an appellate court will reverse a sentence "only if it determines by clear and convincing evidence that the record does not

support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. Clear and convincing evidence is that " 'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Id.* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

Analysis

**{¶59}** At the sentencing hearing, when the trial court was pronouncing Grim's sentence, and providing its analysis regarding the seriousness and recidivism factors pursuant to R.C. 2929.12(B), the trial court stated as follows:

> I also find that the offenses were committed as part of an effort in organized crime. I've sat through two trials now of these events. In the trial of Josia Bush, Elijah Barrett testified very clearly that all three of the defendants – Elijah Barrett, Ethan Grim, and Josia Bush – agreed that they would go to this home and take the weed and cash by force if necessary. They armed themselves. They created a plan, and it reflected, in my view, a view of how organized crime operates with its planning stage, preparation, and execution of the crimes.

(Jan. 24, 2023, Tr. at 20).

**{¶60}** Grim contends that the trial court erred by referencing Bush's trial at Grim's sentencing because it was outside of the record. However, Grim did not object to the trial court's statement, thus he has waived all but plain error. *State v. Wagner*, 8th Dist. Cuyahoga No. 109678, 2023-Ohio-1215, ¶ 24.

**{¶61}** When reviewing this matter for plain error, we emphasize that the information purportedly referenced from Bush's trial was also contained in Grim's trial through Barrett's testimony, thus the record supports the trial court's findings. Since the record supports the trial court's findings we do not find plain error with respect to Grim's sentence. *See id.* Therefore, Grim's fifth assignment of error is overruled.

*Conclusion*

**{¶62}** Having found no error prejudicial to Grim in the particulars assigned and argued, his assignments of error are overruled and the judgment of the Logan County Common Pleas Court is affirmed.

***Judgment Affirmed***

**MILLER, P.J. and WILLAMOWSKI, J., concur.**

**/hls**