[Cite as *State v. Barrett*, 2024-Ohio-1108.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

ELIJAH BARRETT,

    DEFENDANT-APPELLANT.

CASE NO. 8-22-44

O P I N I O N

Appeal from Logan County Common Pleas Court
Trial Court No. CR 21 06 0162

Judgment Affirmed

Date of Decision: March 25, 2024

APPEARANCES:

    *Victoria Ferry* for Appellant

    *Eric C. Stewart* for Appellee

**MILLER, J.**

{¶1} Defendant-Appellant, Elijah Barrett ("Barrett"), appeals the November 22, 2022 judgment entry of the Logan County Court of Common Pleas. At the time of the underlying charges, Barrett was fifteen years old. Following probable cause and amenability hearings, the Family Court Division ("juvenile court") granted the State's motion to relinquish jurisdiction to the General Division ("adult court") and Barrett's case was transferred to the adult court for criminal prosecution. Thereafter, Barrett was indicted on seven felony counts with related firearm specifications. He pleaded guilty to three of the charges while the State dismissed the others, and the adult court sentenced him to an aggregate twenty-five to twenty-seven years to life in prison. Barrett now argues his due process and confrontation rights were violated and it was error to transfer his case to the adult court. For the reasons that follow, we affirm.

## I.     FACTS AND PROCEDURAL HISTORY

### A.     Incident and Complaint in Juvenile Court

{¶2} This case arose from a November 27, 2019 home invasion in Bellefontaine, Ohio, during which multiple residents were assaulted and two residents were shot and killed. The State alleged Barrett and two other juveniles, Josia Bush ("Bush") and Ethan Grim ("Grim"), trespassed in the home with the purpose of robbing the occupants with a firearm. The State further alleged they

(Barrett, Bush, and Grim) ordered Kayla Foulks ("Foulks") upstairs at gunpoint; struck both Jamie Crum ("Crum") and Kiley Titus ("Titus") over the head with a firearm; and shot both Anthony Scartz ("Scartz") and Caleb Chamberlin ("Chamberlin") in the head, causing their deaths. At the time of the home invasion, Barrett was fifteen, Bush was sixteen, and Grim was seventeen years old.

{¶3} Additional background regarding the home invasion is contained in the recent opinions we issued on appeals from Barrett's co-defendants. *See State v. Bush*, 3d Dist. Logan No. 8-22-37, 2023-Ohio-4473, ¶ 2; *State v. Grim*, 3d Dist. Logan No. 8-23-01, 2023-Ohio-4474, ¶ 2-4.

{¶4} The Amended Delinquency Complaint filed against Barrett in the juvenile court set forth the following seven counts, along with a firearm specification for each of the counts:

1) Complicity to Aggravated Burglary, in violation of R.C. 2911.11(A)(1), (2), (B) and R.C. 2923.03(A)(1)-(4), (F), a felony of the first degree if committed by an adult;

2) Complicity to Aggravated Robbery, in violation of R.C. 2911.01(A)(1), (3), (C) and R.C. 2923.03(A)(1)-(4), (F), a felony of the first degree if committed by an adult;

3) Complicity to Kidnapping, in violation of R.C. 2905.01(A)(2), (C)(1) and R.C. 2923.03(A)(1)-(4), (F), a felony of the first degree if committed by an adult;

4) Complicity to Felonious Assault, in violation of R.C. 2903.11(A)(2), (D)(1)(a) and R.C. 2923.03(A)(1)-(4), (F), a felony of the second degree if committed by an adult;

5) Complicity to Felonious Assault, in violation of R.C. 2903.11(A)(2), (D)(1)(a) and R.C. 2923.03(A)(1)-(4), (F), a felony of the second degree if committed by an adult;

6) Complicity to Murder, in violation of R.C. 2903.02(B), (D) and R.C. 2923.03(A)(1)-(4), (F), an unclassified felony if committed by an adult; and,

7) Complicity to Murder, in violation of R.C. 2903.02(B), (D) and R.C. 2923.03(A)(1)-(4), (F), an unclassified felony if committed by an adult.

(Amended Delinquency Complaint).

### B. Preliminary Hearing in Juvenile Court Regarding Probable Cause

{¶5} On July 15-16, 2020, the juvenile court held a preliminary hearing on the State's motion to relinquish jurisdiction over Barrett, pursuant to Juv.R. 30. (Oct. 26, 2020 Judgment Entry). Barrett was present at the hearing, along with his two attorneys. The hearing was a joint probable cause hearing for Barrett and his two co-delinquents. The stated purpose for the hearing was to determine if there was probable cause to believe Barrett committed the acts alleged and whether the acts would constitute criminal offenses if committed by an adult. (*Id.*).

{¶6} At the hearing, the State presented the testimony of eight witnesses. The evidence showed the incident took place around 11:30 p.m. on November 27, 2019 at 601 West Columbus Avenue in Bellefontaine, Ohio. Seven people lived at the house: Crum; Scartz, who was Crum's son; Steven Travis ("Travis"), Crum's

younger son; Foulks, who was Scartz's pregnant girlfriend; Chamberlin, Titus, and Jada Nichols ("Nichols"), the three of whom were Scrartz's friends.

{¶7} Austin Allen ("Allen") was an adult indicted for the same charges as the three juveniles. During the hearing, a recording of Allen's November 29, 2019 police interview was played during the testimony of one of the investigating detectives. In the interview, Allen told the police he picked up Grim and Bush in a car earlier on the day of the incident, at Barrett's request. Allen explained that Barrett, Grim, and Bush together planned to rob someone who had marijuana. In exchange for some money, Allen agreed to drop the three off near Scartz's home (which he did), and Allen waited for them in the car. According to Allen, about ten to fifteen minutes later, the three ran back to the car and got in. Barrett had been shot in the leg and was bragging about shooting two people. Allen then drove the injured Barrett to Mercy Health hospital in Urbana, where he dropped Barrett off.

{¶8} Foulks testified Scartz sold drugs out of the home at 601 West Columbus Avenue. The night of the home invasion, three males, each wearing a facemask, opened the front door of the home and walked inside without knocking or asking for permission to enter. Four of the home's residents were inside at the time; the other three residents—Scartz, Chamberlin, and Nichols—had gone to Walmart. One of the three intruders pointed a gun at Foulks and said "don't fucking move," and subsequently demanded she go upstairs. (July 15, 2020 Tr. at 161-164). Foulks then proceeded up the stairs, with someone else behind her and the intruder

with the gun in front of her, leading her up the stairs. Foulks testified one of the intruders lifted "up his arm while holding his gun and hit [Titus] twice in the head." (*Id.* at 167.)

{¶9} Not knowing there were intruders in the home, Crum testified she walked to the home's bathroom, she turned to close the door, she saw a person in a mask, she tried to close the door, and the masked person shoved the door open and hit her in the head with a blunt, sharp object. (*Id.* at 204-205). Crum later went to the hospital, where her wound was stapled where she had been hit with the object. (*Id.* at 206).

{¶10} Foulks testified that, while upstairs, one of the intruders pointed a gun at her, told her he would "blow your fucking head off," and kept demanding she tell him "where the money was." (*Id.* at 167-168, 186-187). After she took him to Scartz's room in response to the demand to tell him where the money was, the intruder snatched something off the lid of a bucket and ran out of the room.

{¶11} Foulks testified she then heard gunshots. By the time she went downstairs, the intruders had left. She saw Chamberlin lying face down, and she saw Scartz at the bottom of the steps. Scartz was taken away by paramedics, and Foulks checked on Chamberlin—who was dead. Scartz later died at the hospital. (*Id.* at 169-172). Crum testified she saw Scartz (her son) get shot in his back, then watched his "head bounce off the wall behind him and him fall to the floor as he was shot in his head." (*Id.* at 208-209).

**{¶12}** Dr. John Daniels, a deputy coroner and forensic pathologist, testified Scartz suffered a gunshot wound to the head and a gunshot wound to the back. Dr. Daniels testified that, to a reasonable degree of medical certainty, Scartz's cause of death was a gunshot wound to the head. (*Id.* at 24, 26-28). Dr. Mary Goolsby, a deputy coroner and forensic pathologist, testified Chamberlin had two gunshot wounds to the head, and that, to a reasonable degree of medical certainty, Chamberlin's cause of death was multiple gunshot wounds to the head. (*Id.* at 48-49, 52, 54-55).

**{¶13}** Ericka Jimenez, a DNA analyst from the Ohio Bureau of Criminal Investigation, testified that DNA analysis placed Barrett at the scene of the crime. Specifically, Barrett's DNA was consistent with that in a blood smear located on a wall at the top of the steps in the home. Additionally, Detective Dwight Salyer of the Bellefontaine Police Department ("Detective Salyer") testified he arrived at the scene and later learned from Travis (one of the seven residents present during the invasion) that an intruder had been shot during the incident. Detective Salyer located Barrett with a gunshot wound at a hospital in Urbana, where Barrett had arrived in the very early morning hours of November 28, 2019, i.e., soon after the incident. Police interviewed Barrett at the hospital on November 28, 2019, and they interviewed Barrett a second time on November 29, 2019 after Barrett was released from the hospital. Grim and Bush were also, separately, interviewed by the police.

**{¶14}** Following the hearing, the juvenile court concluded there was probable cause to support that Barrett committed the seven charged offenses, along with the related firearm specifications. (Oct. 26, 2020 Judgment Entry). The juvenile court also ordered a full investigation of each of the three juveniles, pursuant to Juv.R. 30(C).

### C. Amenability Hearing in Juvenile Court

**{¶15}** On March 3, 2021, the juvenile court held an amenability hearing on the State's motion to relinquish jurisdiction over Barrett. (June 14, 2021 Judgment Entry). Once again, Barrett was present at the hearing, along with his two attorneys. (*Id.*). The court heard testimony from two State's witnesses. First was Dr. Carla Dreyer, who completed a bindover evaluation of Barrett and whose report was admitted as an exhibit. Second was Probation Officer Amy Johnson, who worked for the Champaign County Juvenile Court. Barrett did not call any witnesses.

**{¶16}** Following the hearing, the juvenile court issued a nine-page Judgment Entry on Amenability that addressed each of the R.C. 2152.12(D) and (E) factors in determining whether to transfer Barrett's case. In addressing the factor at R.C. 2152.12(D)(7) of "The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system," the Judgment Entry stated:

> This factor applies. * * * The records reflect that beginning in May 2016 and continuing throughout the remainder of the year, Juvenile Barrett was a 'frequent flyer' in the Court. He engaged in unruly and

delinquent behavior in school and throughout the community. Beginning in school year 2016, the Assistant Principal reported that he had 33 incidents. Multiple detention hearings were held. Multiple probation violations were filed. Multiple complaints for contempt of court were filed. The Juvenile would pick up new violations before prior violations could be resolved. He was ordered to have no contact with Juvenile Ethan Grim which he ignored. Juvenile Barrett exhibited behaviors that were defiant in nature and showed complete disrespect for persons and property. He was scratching students, making threats, leaving home and school without permission, violating clear court orders, violating curfew, and being disrespectful to teachers, bus drivers, the Court, his probation officer, law enforcement officers and his parents. Juvenile Barrett was also provided with repeated and clear instructions regarding his ankle monitoring system which he ignored. * * * Juvenile admitted to abusing different drugs over the course of his life to Dr. Dreyer.

In December 14, 2016, Champaign County Judge Gilbert ordered Juvenile Barrett to go to the CRC (Community Residential Center) where he was ordered to participate in individual and family counseling and follow any release recommendations; successfully complete the CRC program; must complete all school work; and that upon his release from the CRC Program, he would be successfully terminated from probation. Probation Officer Johnson testified that CRC is located in Marysville, Ohio, and is a 90-day treatment program.

Subsequent to his release from treatment (sometime in March 2017), two complaints were filed in April 2017 * * * wherein Juvenile Barrett's family reported him as missing. He was located and returned to his father but later left again that evening. He was held in the detention center for unruly/runaway charges due to being a community threat and in danger of picking up new charges. Sixteen days later on May 25, 2017, his initial appearance and pre-trial hearing were held. The Court released him under house arrest with a GPS ankle monitor along with no contact orders including Ethan Grim.

The Adjudication Hearing took place on August 14, 2017, wherein he admitted to running away twice in one day and to the amended charge of disorderly conduct which was initially charged as a felony from events that took place in May 2017 where Ethan Grim was present.

* * * Juvenile Barrett was charged with stealing a firearm on or about October 17, 2017, a felony of the third degree. He later entered an admission to the amended charge of attempted theft of a firearm, F4 in June 2018. Juvenile Barrett was committed to the Department of Youth Services for a minimum period of 6 months up and through his 21st birthday. Judge Gilbert suspended the commitment and placed the youth at West Central Juvenile Rehabilitation Center. The order went on to state that upon his release he would be under community control and placed on Level II probation. Probation Officer Johnson explained that West Central is considered a community control facility with lock down for those adjudicated with a felony. Juvenile Barrett was transported to the facility on June 28, 2018, where he stayed for approximately one year. His stay was extended.

In May 2019, Juvenile Barrett was successfully released from West Central Juvenile Rehabilitation Center. He was released to the custody of his father, placed on community control – Level II probation for 60 days.

Three months later, a complaint for probation violation was filed on Juvenile Barrett. On August 28, 2019, the juvenile failed to appear resulting in the issuance of an arrest warrant. A statewide warrant was issued * * *.

A pre-trial hearing was held on September 10, 2019, whereupon the juvenile admitted violating the terms of his community control. His probation was extended for 30 days.

On October 10, 2019, Judge Gilbert signed an order successfully terminating Juvenile Barrett's probation. On the very same day of October 10, 2019, an unruly complaint * * * was filed because Juvenile Barrett ran away from school again without permission. His initial hearing was held on November 5, 2019, wherein he entered admissions to three pending unruly cases and was placed again on Community Control – Level I probation which terms the juvenile is required to observe for the first semester of the 2019-2020 school year. However, during the intervening time period between the filing of the complaint and the disposition, two more unruly complaints * * * were processed, involving Juvenile Barrett walking away from his first day of school Mac-O-Cheek and not returning home. He was reportedly seen leaving in a silver Honda with a white male driving.

> The Urbana Police Officer noted on the complaint that they have dealt with Elijah S. Barrett 101 times. The other unruly complaint involved his habitual truancy.
>
> Based upon the foregoing, the Court finds that rehabilitation will not occur in the juvenile system.

(June 14, 2021 Judgment Entry at 3-5). Within this same subsection, the juvenile court noted: "Due to the volume of records and numerous unruly and delinquency actions, the Court has not addressed [Barrett's] entire history as set out in the certified records in State's Exhibit 4." (*Id.*)

{¶17} Addressing the factor at R.C. 2152.12(D)(9) of "There is not sufficient time to rehabilitate the child within the juvenile system," the Judgment Entry stated:

> This factor applies. The Court finds that there is not sufficient time to rehabilitate this Juvenile and adopts the findings in this regard made by Dr. Dreyer. Juvenile Barrett is not amenable to treatment. He lacks the insight and motivation to change. He had all Fs in 8th grade and despite efforts, refused to engage in school. Instead, he was disrespectful to school officials and walked off multiple times without permission. He did the same things at the alternative school. Upon review of the assessments and findings of Dr. Dreyer, the Court finds that Juvenile Barrett cannot be rehabilitated. Dr. Dreyer testified that this Juvenile had the benefit of programs (Thinking for a Change and other cognitive programs) but failed to implement the lessons and life skills.
>
> Juvenile Barrett moved to Bellefontaine where he stayed with his girlfriend. Instead of making new friends in a new town, he invites Ethan Grim and Josia Bush to come to Bellefontaine to celebrate the release of Josia from detention. He failed to implement the lessons learned from programs and his past mistakes. Juvenile Barrett had no long stretches of proving to be a law-abiding child. He was constantly in and out of Court for almost four years. He clearly did not respond favorably to past efforts regarding his rehabilitation. Dr. Dreyer testified that his prognosis if sent to DYS is poor and the Court agrees.

-11-

(*Id.* at 6). In its assessment of the R.C. 2152.12(D)(1) factor, the juvenile court noted: "[t]wo individuals suffered the worst serious physical harm—death." (*Id.* at 2). Ultimately, the juvenile court found seven of the nine factors favoring transferring jurisdiction applied to Barrett.

**{¶18}** The juvenile court found none of the factors favoring retaining jurisdiction to be applicable. Among the court's assessment of those factors, the Judgment Entry addressed whether there was sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system and concluded:

> This factor does not apply. Defense argues that there is sufficient time to rehabilitate the child. As indicated hereinbefore, there is not. This juvenile received family counseling through a relative's case, had the supervision of a probation officer, went to a 90-day treatment program, spent a year in a residential facility, and was afforded multiple chances by the Court to learn from his poor choices. In Fall 2019, he left his home county of Champaign and began living with a family in Logan County. Rather than re-think his past actions and choices, he engaged in the same pattern of breaking the law. Despite being court-ordered to have no contact with Ethan Grim, the records support that he violated the clear order. Juvenile Barrett has demonstrated his propensity to breaking the rules, violating the laws, and lack of amenability in the juvenile system.

(*Id.* at 7-8). The juvenile court further found that "Barrett is not amenable and cannot be rehabilitated with services available in the juvenile system, including the Department of Youth Services" and "that a blended sentence in this action would not protect the community." (*Id.* at 8).

**{¶19}** In accordance with R.C. 2152.12(B)(3), the juvenile court found the applicable factors under R.C. 2152.12(D) outweighed the applicable factors under R.C. 2152.12(E).  The juvenile court also found Barrett was fifteen years old at the time of the alleged offenses.  (*Id.*).  Therefore, the juvenile court granted the motion to relinquish jurisdiction and ordered, pursuant to R.C. 2152.12, that Barrett's case be transferred to the adult court for further proceedings.  (*Id.*).

### D.     General Division Indictment, Plea, and Sentencing

**{¶20}** In the adult court, Barrett's Indictment charged him with the same seven counts as set forth in his Amended Delinquency Complaint, as well as a firearm specification for each count pursuant to R.C. 2941.145(A).  Ultimately, and pursuant to a negotiated plea agreement, Barrett entered a plea of guilty to three of the charges and the State applied to dismiss the other four charges.  (Dec. 7, 2021 Judgment Entry; Dec. 10, 2021 Judgment Entry).  At sentencing, having accepted Barrett's petition and the State's application, the court found Barrett had been convicted of Count Two (Complicity to Aggravated Robbery), Count Four (Complicity to Felonious Assault), and Count Six (Complicity to Murder), along with the firearm specification to Count Six.  (Nov. 22, 2022 Judgment Entry).  For Count Two, the court sentenced Barrett to a term of four to six years in prison.  For Count Four, the court sentenced Barrett to three years in prison.  For Count Six, the court sentenced Barrett to fifteen years to life in prison, plus three years in prison for the firearm specification.  The trial court ordered the sentences to be served

-13-

consecutively, for an aggregate term of twenty-five to twenty-seven years to life in prison. This appeal followed.

## II. ASSIGNMENTS OF ERROR

{¶21} Barrett raises six assignments of error for our review:

### First Assignment of Error

**The trial court erred when it failed to suppress Elijah's statements to the police because they were involuntary and obtained in violation of the right to due process of law as guaranteed by the Fourteenth Amendment to the U.S. Constitution and Section 16, Article I of the Ohio Constitution. (11.22.22 Final Judgment Entry).**

### Second Assignment of Error

**The juvenile court erred when it consolidated three juvenile cases for a single, joint probable cause hearing, in violation of his right to due process as guaranteed by the Fourteenth Amendment to the U.S. Constitution and Article I, Section 16, Ohio Constitution. (11.22.22 Final Judgment Entry).**

### Third Assignment of Error

**The juvenile court erred when it admitted the interviews of Elijah's codefendants, in violation of his right to confrontation as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and Article I, Section 10, Ohio Constitution. (11.22.22 Final Judgment Entry).**

### Fourth Assignment of Error

**The trial court abused its discretion when it transferred Elijah's cases for criminal prosecution, in violation of R.C. 2152.12(B); Fifth and Fourteenth Amendments to the U.S. Constitution; and Article I, Section 10, Ohio Constitution. (11.22.22 Final Judgment Entry).**

-14-

**Fifth Assignment of Error**

**The trial court erred when it sentenced Elijah Barrett to an indefinite sentence under the unconstitutional Reagan Tokes Law. Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution; Article I, Section 5 and 16 of the Ohio Constitution. (11.22.22 Final Judgment Entry).**

**Sixth Assignment of Error**

**Elijah was deprived of his right to the effective assistance of counsel in juvenile court. Fifth and Fourteenth Amendments to the U.S. Constitution; Article I, Section 16 of the Ohio Constitution. (11.22.22 Final Judgment Entry).**

### III.    DISCUSSION

{¶22} In his reply brief, Barrett conceded his fifth assignment of error in light of the Ohio Supreme Court's recent decision in *State v. Hacker*, --- Ohio St.3d ---, 2023-Ohio-2535. (*See* Appellant's Reply Brief at 9). Therefore, we proceed with addressing the remaining assignments of error, but not in the order presented.

#### A.    Third Assignment of Error

{¶23} In the third assignment of error, Barrett contends the juvenile court erred and violated his right to confrontation when it admitted the interviews of his co-delinquents at the probable cause hearing. He argues he was entitled to confront and cross-examine both of his co-delinquents, Bush and Grim. In response, the State argues the Confrontation Clause does not apply to juvenile preliminary hearings in Ohio. We addressed this same issue in *Grim*.

### 1.    Standard of Review

**{¶24}** "Generally, the admission of evidence lies within the broad discretion of the trial court." *Grim*, 2023-Ohio-4474, at ¶ 11, citing *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62. "However, we review de novo evidentiary rulings that implicate the Confrontation Clause." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97. De novo review is independent, without deference to the lower court's decision. *State v. Azeen*, 163 Ohio St.3d 447, 2021-Ohio-1735, ¶ 59.

### 2.    Applicable Law

**{¶25}** "Juvenile courts have exclusive initial subject-matter jurisdiction over any case involving a person alleged to be delinquent for having committed, when younger than eighteen years of age, an act which would constitute a felony if committed by an adult." *State v. Golphin*, 81 Ohio St.3d 543, 544-45, 692 N.E.2d 608 (1998). "Before such an individual may be tried as an adult in common pleas court, the juvenile court must comply with" certain statutory provisions pursuant to procedures established by the rules of juvenile procedure. *Id.* at 545; *see also, e.g.,* R.C. 2152.10; R.C. 2152.12; Juv.R. 30.

**{¶26}** "R.C. 2152.12 governs the transfer of a child from the juvenile court to the general division of the common pleas court." *Bush*, 2023-Ohio-4473, at ¶ 20. "Pursuant to R.C. 2152.12(B), a juvenile court has the discretion to transfer a case for criminal prosecution if the court finds that three conditions are met: (1) the child was 14 or older at the time of the act charged; (2) there is probable cause to believe

that the child committed the act charged; and (3) the child is 'not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions.'" *Id.*, quoting R.C. 2152.12(B). Under Ohio's Rules of Juvenile Procedure, "[i]n any proceeding where the court considers the transfer of a case for criminal prosecution, the court shall hold a preliminary hearing to determine if there is probable cause to believe that the child committed the act alleged and that the act would be an offense if committed by an adult." Juv.R. 30(A).

**{¶27}** In *Grim*, we held that, because "the probable cause hearing here did not constitute a trial, the Confrontation Clause" did not apply to bar one of the State's witnesses from testifying at the preliminary hearing regarding statements elicited from Grim's co-delinquents. *Grim*, 2023-Ohio-4474, ¶ 10, 16. We quoted at length from a Twelfth District opinion that had recently addressed the issue:

> The United States Supreme Court has explained that '[t]he right to confrontation is basically a trial right.' *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). A juvenile transfer hearing "is not a trial as it does not 'find as a fact that the accused minor is guilty of the offense charged. It simply finds the existence of probable cause to so believe.'" *State v. Garner*, 6th Dist. Lucas No. L-18-1269, 2020-Ohio-4939, ¶ 19, quoting *State v. Iacona*, 93 Ohio St.3d 83, 93 (2001). The United States Supreme Court 'has repeatedly declined to require the use of adversarial procedures to make probable cause determinations.' *Kaley v. United States*, 571 U.S. 320, 338, 134 S.Ct. 1090, 188 L.Ed.2d 46 (2014). The federal courts have repeatedly held that the Sixth Amendment's Confrontation Clause does not apply to preliminary hearings. Likewise, the Ohio Supreme Court has held that the constitutional right to confront one's accusers 'relates to the *actual trial* for the commission of the offense and not to the

> preliminary examination * * *.'" (Emphasis added.) *Henderson v. Maxwell*, 176 Ohio St. 187, 188, 198 N.E.2d 456 (1964).

*Id.* at ¶ 14, quoting *State v. Fuell*, 12th Dist. Clermont No. CA2020-02-008, 2021-Ohio-1627, ¶ 29-30. "[W]e agree[d] with the other Ohio Appellate Districts, and the statements from the Supreme Court of the United States, that confrontation is essentially a 'trial right.'" *Id.* at ¶ 16; *see also State v. Riley*, 5th Dist. Muskingum No. CT2012-0022, 2013-Ohio-1332, ¶ 49 ("[t]he juvenile bindover procedure is analogous to the adult preliminary hearing: both evaluate probable cause, neither is a determination of a defendant's guilt beyond a reasonable doubt").

{¶28} In addition to the Sixth Amendment's Confrontation Clause, the Ohio Constitution provides: "*In any trial*, in any court, the party accused shall be allowed to * * * meet the witnesses face to face." (Emphasis added.) Ohio Constitution, Article I, Section 10. The Ohio Supreme Court has held that Section 10, Article I of the Ohio Constitution provides no greater right of confrontation than the Sixth Amendment to the U.S. Constitution. *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 12.

### 3. Analysis

{¶29} Based on *Grim*, which involved the exact same probable cause hearing here, we find no error by the juvenile court, or violation of Barrett's Confrontation Clause rights, when it admitted the interviews of Barrett's co-delinquents at the probable cause hearing. *Grim*, 2023-Ohio-4474, at ¶ 16; *see also In Re B.W.*, 7th

Cir. Mahoning No. 17 MA 0071, 2017-Ohio-9220, ¶ 1, 41, 48 (explaining, "[w]e do not believe the juvenile court (at a probable cause hearing held prior to transferring a juvenile to the general division) was bound by confrontation clause standards for admissibility of evidence," and deciding the juvenile court should have considered co-delinquent's statements to a detective). Moreover, Barrett has not directed us to any U.S. Supreme Court or Ohio Supreme Court authority holding that the right to confrontation applies to a juvenile court's preliminary hearing. Barrett's third assignment of error is overruled.

### B. First Assignment of Error

{¶30} In his initial assignment of error, Barrett argues his statements to the police during his first and second interviews were involuntary and obtained in violation of the right to due process, resulting in the court committing plain error by admitting the statements at the probable cause hearing. However, we need not determine whether the court committed error by admitting his statements to police. As shown below, even without considering Barrett's statements, there was more than enough evidence "to determine * * * there is probable cause to believe that [Barrett] committed the act alleged and that the act would be an offense if committed by an adult." Juv.R. 30(A).

### 1. Standard of Review

{¶31} The determination of "whether the state presented sufficient credible evidence of probable cause * * * is reviewed de novo." *State v. Martin*, 170 Ohio

St.3d 181, 2022-Ohio-4175, ¶ 23. The juvenile court's credibility assessments at a probable-cause hearing are entitled to deference on review; this deference is directed to the reliability of the evidence presented, not to the ultimate resolution of competing evidence. *Id.* at ¶ 23, 27.

### 2. Applicable Law

#### a. Probable cause hearing in juvenile court for purposes of binding over to adult court

{¶32} "In the context of establishing probable cause for purposes of binding a juvenile over to adult court, '[t]he state must provide credible evidence of every element of an offense to support a finding that probable cause exists to believe that the juvenile committed the offense.'" *In re E.S.*, --- Ohio St.3d ---, 2023-Ohio-4273, ¶ 23, quoting *State v. Iacona*, 93 Ohio St.3d 83, 752 N.E.2d 937 (2001), paragraph three of the syllabus. "'[P]robable cause exists when the facts and circumstances are sufficient to provide a reasonable belief that the accused has committed a crime.'" *Id.* at ¶ 22, quoting *Martin* at ¶ 17. "'The inquiry requires the judge to review all the circumstances and make a practical, common-sense decision as to whether probable cause is present.'" *Id.*

{¶33} The state's burden is *not* proof beyond a reasonable doubt or a preponderance of the evidence. *In re E.S.* at ¶ 23; *Martin* at ¶ 18. The state's burden is to produce evidence that raises more than a mere suspicion of guilt. *In re E.S.* at ¶ 23. "The juvenile court presiding over a probable-cause hearing does not sit as

the ultimate trier of fact." *Martin* at ¶ 31. "It is tasked only with conducting a preliminary hearing to determine whether the state has presented sufficient credible evidence to proceed with its prosecution in a criminal court." *Id.*

### b. Complicity

{¶34} All of the offenses against Barrett were charged under a theory of complicity to commit an offense that would be a felony if committed by an adult. (*See* Amended Delinquency Complaint; *see also* Indictment). The complicity statute provides, in relevant part:

> (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
>> (1) Solicit or procure another to commit the offense;
>>
>> (2) Aid or abet another in committing the offense;
>>
>> (3) Conspire with another to commit the offense in violation of [R.C. 2923.01];
>>
>> (4) Cause an innocent or irresponsible person to commit the offense.
>
> (B) It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.
>
> (C) No person shall be convicted of complicity under this section unless an offense is actually committed, but a person may be convicted of complicity in an attempt to commit an offense in violation of [R.C. 2923.02].
>
> * * *

(F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. * * *

R.C. 2923.03(A), (B), (C), (F). The statutes and requirements for the individual underlying offenses are set forth below in the sections analyzing the specific counts.

### 3. Analysis

{¶35} The juvenile court concluded there was probable cause to support that Barrett committed the seven charged offenses, along with the connected firearm specifications. (Oct. 26, 2020 Judgment Entry). As set forth below, based on the evidence presented at the July 15-16, 2020 preliminary hearing, we likewise determine there was probable cause to believe Barrett committed the seven charged complicity offenses, each of which would be an offense if committed by an adult, as well as the connected firearm specifications. Juv.R. 30(A). We make this determination even without considering Barrett's statements to the police.

### a. Complicity to aggravated burglary

{¶36} The Amended Delinquency Complaint alleged Barrett, Bush, and Grim trespassed in the residence with the purpose to rob the occupants by means of a firearm, during which time they either inflicted, or attempted or threatened to inflict, physical harm on the various occupants of the home. The aggravated burglary statute provides, in relevant part:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * *, when another person other than an

accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

R.C. 2911.11(A). Regarding the requisite "trespass," we recently explained:

One way a person can commit a 'trespass' is by '[k]nowingly enter[ing] or remain[ing] on the land or premises of another,' 'without privilege to do so.' R.C. 2911.21(A)(1). And, '[p]rivilege' 'means an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity.' R.C. 2901.01(A)(12).

*State v. Choudri*, 3d Dist. Marion No. 9-22-70, 2023-Ohio-4476, ¶ 18.

**{¶37}** The State provided sufficient credible evidence of each element of complicity to aggravated burglary to support finding that probable cause existed to believe Barrett committed the offense. For example, among other supporting evidence:

- Allen stated during his police interview that Barrett, Grim, and Bush together planned to rob someone; he then dropped the three off near Scartz's home; and, about ten to fifteen minutes later, the three got back in the car, Barrett had been shot in the leg, and Barrett bragged about shooting two people.

- Foulks testified three males, who were wearing facemasks, walked in through the front door of the residence, without knocking or asking for permission to enter. She also testified the door had been shut, so they had to open it to come into the residence.

- Foulks testified four residents were inside the home at the time the intruders entered.

-23-

- Foulks testified Scartz was selling drugs out of the home.

- Foulks testified one of the three masked males pointed a gun at her and said "don't fucking move." (July 15, 2020 Tr. at 163).

- Ericka Jimenez, a DNA analyst from the Ohio Bureau of Criminal Investigation, testified that DNA analysis placed Barrett at the scene of the crime (specifically, Barrett's DNA was consistent with that in a blood smear found on a wall at the home).

- Detective Salyer testified he learned from Travis that one of the intruders had been shot during the incident, and Detective Salyer located Barrett with a gunshot wound at a hospital in Urbana, where Barrett had arrived in the very early morning hours of November 28, 2019.

### b. Complicity to aggravated robbery

**{¶38}** The Amended Delinquency Complaint also contained a count for aggravated robbery, with allegations similar to those in the aggravated burglary count. The aggravated robbery statute provides, in relevant part:

(A) No person, in attempting or committing a theft offense, as defined in [R.C. 2913.01], or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

* * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

R.C. 2911.01(A)(1), (3).

**{¶39}** The State provided sufficient credible evidence of each element of complicity to aggravated robbery to support finding that probable cause existed to

believe Barrett committed the offense. In addition to the evidence that was presented to show Barrett's complicity to aggravated burglary, the State also presented Foulks' testimony that one of the masked males pointed a gun directly at her saying he would "blow your fucking head off," and he kept demanding she tell him "where the money was." (July 15, 2020 Tr. at 167-168, 186-187). After taking him to Scartz's room in response to the demand to tell him where the money was, the masked male snatched something off the lid of a bucket in Scartz's room and then ran out of the room.

### c. Complicity to kidnapping

{¶40} The Amended Delinquency Complaint alleged Barrett, Bush, and Grim ordered Foulks to move at gunpoint from the place where she was found, for the purpose of facilitating an aggravated robbery and aggravated burglary or flight thereafter. The kidnapping statute provides, in relevant part:

> (A) No person, by force, threat, or deception, * * * by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * *
>
>> (2) To facilitate the commission of any felony or flight thereafter; * * *

R.C. 2905.01(A)(2).

{¶41} Among all of the other evidence at the probable cause hearing, Foulks testified one of the three masked males pointed a gun at her and said "don't fucking move," and he subsequently "demanded [she go] upstairs." (July 15, 2020 Tr. at

161-164). Foulks then proceeded up the stairs, with someone else behind her and the intruder with the gun in front of her, leading her up the stairs. This testimony, along with the previously-mentioned evidence, constituted sufficient credible evidence of each element of complicity to kidnapping to support finding that probable cause existed to believe Barrett committed the offense.

### d. Complicity to felonious assault

**{¶42}** The Amended Delinquency Complaint included two counts of complicity to felonious assault. One count related to Crum being hit in the head as she went into the bathroom and the other related to Titus being pistol whipped. The felonious assault statute provides, in relevant part:

> (A) No person shall knowingly do * * * the following: * * *
>
>> (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance.

R.C. 2903.11(A)(2).

**{¶43}** The State provided sufficient credible evidence of each element of complicity to felonious assault of Crum and of Titus to support finding that probable cause existed to believe Barrett committed the offenses. Evidence at the probable cause hearing included Foulks' testimony that one of the intruders lifted "up his arm while holding his gun and hit [Titus] twice in the head." (July 15, 2020 Tr. at 167.) Crum testified she walked to the bathroom, she turned to close the door, she saw a person in a mask, she tried to close the door, and the person shoved the door open

and hit her in the head with a blunt, sharp object. (*Id.* at 204-205). Crum later went to the hospital and her head was stapled where she had been hit with the object. (*Id.* at 206).

### e.    Complicity to murder

{¶44} The Amended Delinquency Complaint included two counts of complicity to murder. The first related to Scartz's death, the other related to Chamberlin's death. The murder statute provides, in relevant part:

> (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of [R.C. 2903.03 or R.C. 2903.04].

R.C. 2903.02(B). Both aggravated burglary and aggravated robbery constitute felonies of the first degree and are both offenses of violence listed in R.C. 2901.01(A)(9). *See* R.C. 2901.01(A)(9), 2911.11(B), and 2911.01(C).

{¶45} Among other evidence at the probable cause hearing, Foulks testified she heard gunshots after one of the masked males had snatched something off the lid of a bucket in Scartz's room and run out of the room. By the time she went downstairs, the intruders had left. She saw Chamberlin lying face down, and she saw Scartz at the bottom of the steps. Additionally, Crum testified she saw Scartz get shot in his back, then watched as he was shot in his head. Dr. John Daniels, a deputy coroner and forensic pathologist, testified Scartz suffered two gunshot wounds, with the shot to the head being fatal. Likewise, Dr. Mary Goolsby, a

deputy coroner and forensic pathologist, testified Chamberlin died of multiple gunshot wounds to the head.

**{¶46}** Considering the record and the evidence presented against him, we conclude that the State provided sufficient credible evidence of each element of complicity to murder Scartz and Chamberlin to support finding that probable cause existed to believe Barrett committed the offenses.

### f. Firearm specifications

**{¶47}** Finally, each count included a firearm specification. The applicable firearm specification statute provides, in relevant part:

> (A) Imposition of a three-year mandatory prison term upon an offender under [R.C. 2929.14(B)(1)(a)(ii)] is precluded unless the indictment, count in the indictment, or information charging the offense specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense. * * *

R.C. 2941.145(A).

**{¶48}** Here, once more without considering Barrett's statements to the police, we conclude the State provided sufficient credible evidence to support the firearm specification for each of the seven offenses. The record is replete with testimony regarding the use of a firearm to effectuate the various offenses. At least one of the intruders had a firearm on or about his person or under his control while committing the offenses and not only displayed and brandished the firearm, but used

it to facilitate the offenses. Moreover, Allen said during his police interview that Barrett bragged about shooting two people. Barrett's first assignment of error is overruled.

### C. Sixth Assignment of Error

{¶49} In the sixth assignment of error, Barrett argues he was denied effective assistance of counsel due to his trial counsel's (1) failure to preserve for appeal the issue of constitutionality of the Reagan Tokes law and (2) failure to object to the introduction of his statements made to police.

{¶50} To establish ineffective assistance of counsel, the appellant "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 264.

{¶51} Here, both of Barrett's alleged instances of ineffective assistance of counsel at least fail at the second requirement, prejudice. Barrett conceded his argument concerning the constitutionality of the Reagan Tokes law was decided contrary to the position advocated in his initial brief. *Hacker*, --- Ohio St.3d ---, 2023-Ohio-2535. And, as shown above in addressing the first assignment of error, his counsel's failure to object to his allegedly involuntary statements made to police did not affect the result of the proceeding. Even without considering Barrett's statements to the police, there was more than enough evidence to find probable

cause for each of the charged offenses and specifications. Barrett's sixth assignment of error is overruled.

### D. Fourth Assignment of Error

**{¶52}** In the fourth assignment of error, Barrett argues that the juvenile court erred in transferring his case to the Common Pleas Division to be prosecuted as an adult. Specifically, he says it was unreasonable for the juvenile court to transfer the case when the safety of the community could be adequately protected, there was appropriate time and resources in the juvenile system, and he was amenable to treatment. In short, this assignment of error attacks the juvenile court's findings in the June 14, 2021 judgment entry on amenability issued after the March 3, 2021 amenability hearing.

### 1. Standard of Review

**{¶53}** In the *Bush* decision, we set forth the applicable standard of review for discretionary-transfer proceedings in juvenile court:

> The Supreme Court of Ohio has consistently applied the abuse-of-discretion standard in the review of discretionary-transfer proceedings from juvenile court to the general division of common pleas court. *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, ¶ 14, 923 N.E.2d 584; *State v. Watson*, 47 Ohio St.3d 93, 95, 547 N.E.2d 1181 (1989). '[A]n amenability hearing is a broad assessment of individual circumstances and is inherently individualized and fact-based. Thus a juvenile court's determination regarding a child's amenability to rehabilitation in the juvenile system is reviewed by an appellate court under an abuse of discretion standard.' *In re M.P.*, at ¶ 14. An abuse of discretion is a decision that was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). 'A review under the abuse-of-discretion standard is a

deferential review.' *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14, 972 N.E.2d 528. 'As long as the [juvenile] court considers the appropriate statutory factors and there is some rational basis in the record to support the court's findings when applying those factors, we cannot conclude that the [juvenile] court abused its discretion in deciding whether to transfer jurisdiction.' *State v. Phillips*, 12th Dist. Clinton No. CA2009-03-001, 2010-Ohio-2711, ¶ 39.

*Bush*, 2023-Ohio-4473, at ¶ 24, quoting *State v. Everhardt*, 3d Dist. Hancock No. 5-17-25, 2018-Ohio-1252, ¶ 19.

### 2.     Applicable Law

**{¶54}** As noted above, the third requirement for a juvenile court to transfer a case for criminal prosecution pursuant to R.C. 2152.12(B) is a determination that "[t]he child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions." R.C. 2152.12(B)(3).  Thus, if a juvenile court finds probable cause at the preliminary hearing, then it shall hold an amenability hearing and consider the R.C. 2152.12 criteria in deciding whether the third requirement is met.  Juv.R. 30(C).  That "statute requires the juvenile court to decide whether the factors in R.C. 2152.12(D) that favor transferring jurisdiction outweigh the factors in R.C. 2152.12(E) that favor retaining jurisdiction."  *Bush*, 2023-Ohio-4473, at ¶ 21.  At the time of the March 3, 2021 amenability hearing, the version of the statute setting forth the factors favoring a transfer of jurisdiction provided:

> (D) In considering whether to transfer a child under division (B) of this section, the juvenile court shall consider the following relevant

factors, and any other relevant factors, in favor of a transfer under that division:

> (1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.
>
> (2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.
>
> (3) The child's relationship with the victim facilitated the act charged.
>
> (4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.
>
> (5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.
>
> (6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.
>
> (7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.
>
> (8) The child is emotionally, physically, or psychologically mature enough for the transfer.
>
> (9) There is not sufficient time to rehabilitate the child within the juvenile system.

R.C. 2152.12(D) (effective October 12, 2016 to April 3, 2023). And, the version of

R.C. 2152.12(E) setting forth the factors weighing against a transfer of jurisdiction

provided:

> (E) In considering whether to transfer a child under division (B) of this section, the juvenile court shall consider the following relevant factors, and any other relevant factors, against a transfer under that division:
>
> > (1) The victim induced or facilitated the act charged.
> >
> > (2) The child acted under provocation in allegedly committing the act charged.
> >
> > (3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.
> >
> > (4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.
> >
> > (5) The child previously has not been adjudicated a delinquent child.
> >
> > (6) The child is not emotionally, physically, or psychologically mature enough for the transfer.
> >
> > (7) The child has a mental illness or intellectual disability.
> >
> > (8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

R.C. 2152.12 (E) (effective October 12, 2016 to April 3, 2023).

### 3. Analysis

**{¶55}** After the amenability hearing, the juvenile court issued a very detailed judgment entry, individually addressing the factors in favor of transfer under R.C. 2152.12(D) and the factors against transfer under R.C. 2152.12(E). (June 14, 2021 Judgment Entry). It found seven of the nine factors favoring transfer applied and none of the eight factors against transfer were applicable. (*Id.*) The juvenile court concluded "that the factors for transfer outweigh the factors against transfer." (*Id.* at 8).

**{¶56}** As recognized above, "the juvenile court has wide latitude in determining whether it should retain or relinquish jurisdiction over a juvenile." *Bush*, 2023-Ohio-4473, at ¶ 39. Here, the juvenile court considered the appropriate statutory factors, and there is at least "some rational basis in the record to support [its] findings when applying those factors." *Id.* at ¶ 24. Therefore, we conclude that the juvenile court did not abuse its discretion in deciding to transfer jurisdiction to the adult court for further proceedings.

**{¶57}** Barrett's arguments on appeal primarily focus on the factors in R.C. 2152.12(D)(7), (D)(9), and (E)(8). Each of those factors was thoroughly addressed by the juvenile court in its judgment entry, as set forth in the Facts and Procedural History section above. The juvenile court explained there was substantial evidence supporting that both 2152.12(D)(7) and (D)(9) applied as factors favoring transferring jurisdiction and there was considerable evidence that 2152.12(E)(8) did

not apply as a factor favoring retaining jurisdiction. Additionally, the evidence presented at the amenability hearing demonstrated Barrett's *extensive* prior involvement with the juvenile system and the attempts to rehabilitate him over the years before the deaths of Scartz and Chamberlin. In our review of the record, we conclude the juvenile court's concerns about the safety of the community and its findings that support the juvenile system's inability to rehabilitate Barrett are fully supported by the record. We disagree with Barrett's contention that it was unreasonable to transfer his case "for prosecution as an adult when the safety of the community could be adequately protected, there was appropriate time and resources in the juvenile system, and [he] was amenable to treatment." (Appellant's Brief at 22). The evidence presented at the amenability hearing showed otherwise.

{¶58} Barrett's fourth assignment of error is overruled.

### E. Second Assignment of Error

{¶59} In the second assignment of error, Barrett contends the juvenile court erred in consolidating three juvenile cases for a single, joint probable cause hearing. At the time of the hearing, Barrett's counsel objected to the juvenile court holding a joint probable cause hearing for all three juveniles: Barrett, Bush, and Grim.

#### 1. Standard of Review

{¶60} Barrett acknowledges we review a trial court's determination on joinder issues under an abuse of discretion standard. *State v. Foster*, 3d Dist. Hancock Nos. 5-22-26 & 5-22-27, 2023-Ohio-1434, ¶ 39. "An abuse of discretion

is more than an error in judgment; it suggests that the decision is unreasonable, arbitrary, or unconscionable." *Id.*, citing *State v. Adams*, 62 Ohio St.2d 151, 157-158, 404 N.E.2d 144 (1980).

### 2. Applicable Law

**{¶61}** Despite there being no reference to joinder in the Rules of Juvenile Procedure, neither party argues joinder is prohibited in juvenile court proceedings. In fact, caselaw shows juvenile courts implement joinder of alleged delinquent children and conduct joint proceedings. *E.g., In re L.W.*, 8th Dist. Cuyahoga No. 99527, 2013-Ohio-5735, ¶ 40 (juvenile court jointly tried co-delinquents at the adjudication hearing); *State v. Marshall*, 1st Dist. Hamilton No. C-150383, 2016-Ohio-3184, ¶ 1-5 (Fischer, P.J.) (juvenile court did not abuse its discretion in relinquishing jurisdiction, where juvenile court had held joint probable-cause hearings for appellant and three other individuals accused of involvement in aggravated robberies).

**{¶62}** Barrett cites the Rules of Criminal Procedure in support of his contention that the juvenile court erred in holding a joint probable cause hearing. However, the criminal rules generally do not apply to juvenile court proceedings, which are considered civil actions. *See* Crim.R. 1(C); *In re Barchet*, 3d Dist. Hancock Nos. 5-02-27, 5-02-28, 5-02-29, 5-02-30, 5-02-31 and 5-02-32, 2002-Ohio-5420, ¶ 27; *In re Anderson*, 92 Ohio St.3d 63, 65, 748 N.E.2d 67 (2001). Even so, courts have looked to the Rules of Criminal Procedure in providing guidance

when addressing joinder issues in juvenile proceedings. *E.g.*, *In re L.W.* at ¶ 38-40 (analyzing Crim.R. 8 and the purposes of joinder in finding the juvenile suffered no prejudice as a result of a joint trial with his co-delinquent); *State v. Majoros*, 8th Dist. Cuyahoga Nos. 42062 and 42063, 1980 WL 355366, *2-3 (Nov. 13, 1980) (looking to the Rules of Criminal Procedure in determining whether the juvenile court erred in joining appellant with three other juveniles in the same proceeding, because the "Rules of Juvenile Procedure do not address the issue of joinder of multiple juvenile defendants").

{¶63} One reason to look at the Criminal Rules for guidance in juvenile delinquency proceedings is the essential protections the Criminal Rules provide to persons accused of violating criminal statutes. For example, Crim.R. 14 provides relief from prejudicial joinder. Furthermore, traditional reasons for joining defendants (i.e., conserving judicial and prosecutorial resources, lessening the expense of multiple trials, diminishing inconvenience to witnesses, and diminishing the possibility of incongruent results) all coincide with Juv.R. 1(B)(2)'s objective "to secure simplicity and uniformity in procedure, fairness in administration, and the elimination of unjustifiable expense and delay." *See State v. Thomas*, 61 Ohio St.2d 223, 225, 400 N.E.2d 401 (1980).

{¶64} The Rules of Criminal Procedure permit, in certain circumstances, the joinder of offenses and the joinder of defendants. Crim.R. 8. Although the law favors joinder, "a trial court should not order joinder where the defendant will be

prejudiced." *Foster*, 2023-Ohio-1434, at ¶ 41; *see also* Crim.R. 14 ("[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses or of defendants * * *, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires"). "Joinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak." *State v. Torres*, 66 Ohio St.2d 340, 343-344, 421 N.E.2d 1288 (1981). Joinder may not be prejudicial "when the evidence is direct and uncomplicated and can reasonably be separated as to each offense." *Id.*

{¶65} To prevail on a claim that the trial court erred in not granting a severance, the accused has the burden to "affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." *State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992). Furthermore, "[i]n a bench trial, the defendant's burden becomes steeper." *State v. Harris*, 8th Dist. Cuyahoga No. 104833, 2017-Ohio-2985, ¶ 8. This is because, "[i]f a jury is permitted to hear multiple cases of distinct and separate crimes, then a trial court with the benefit of the legal experience necessary to the position would be in a better position to sift through the relevant evidence." *Id.* at ¶ 15; *see also State v. Thomas*, 8th Dist. Cuyahoga No. 90623, 2008-Ohio-6148, ¶ 33-34, 39 (no showing

of prejudice by joinder with co-defendants' cases in a joint bench trial; the trial court in a bench trial is presumed to have considered only the relevant, material, competent evidence in arriving at its judgment, unless it affirmatively appears otherwise).

### 3. Analysis

**{¶66}** During the probable cause hearing, it was undisputed that the amended delinquency complaints for all three juveniles were the same. (July 15, 2020 Tr. at 12). Furthermore, all charged offenses arose from the same incident. This presented a situation where a joint hearing aligned with many of joinder's purposes. *Foster*, 2023-Ohio-1434, at ¶ 40, quoting *Thomas*, 61 Ohio St.2d at 225. Additionally, an experienced juvenile judge, not a jury, was the decision maker at this particular proceeding. "We can presume the trial court is competent and capable of determining the facts pertinent to the distinct elements of the crimes in each separate case," unless the appellant fulfills his or her obligation in identifying something in the record that demonstrates the trial court considered improper evidence. *Harris*, 2017-Ohio-2985, at ¶ 13.

**{¶67}** Barrett has not met his burden to demonstrate his rights were prejudiced. He asserts that "[t]he breadth of these proceedings resulted in pronounced confusion regarding the nature and extent of [his] culpability." (Appellant's Brief at 19). However, he fails to point to any confusion, let alone "pronounced confusion." Instead, his assertion is based on the testifying victims'

inability "to distinctly identify each person and how each individual was specifically involved." (*Id.*) Not only does this ignore other evidence presented, it also ignores the fact Barrett was charged under a theory of complicity. All of the delinquency offenses were related and the evidence as to each—for purposes of the juvenile court's determination at that stage—was simple, direct, and quite strong. *See Torres*, 66 Ohio St.2d at 343-344.

{¶68} We do not find the juvenile court abused its discretion in overruling Barrett's request to sever the probable cause hearing into separate hearings for each of the three juveniles and, instead, holding a single, joint probable cause hearing. *See In re L.W.*, 2013-Ohio-5735, at ¶ 40; *Majoros*, 1980 WL 355366, at *3; *State v. Eames*, 3d Dist. Union No. 14-93-3, 1994 WL 66643, *7 (Mar. 7, 1994) (appellant failed to show he was prejudiced by joinder of the defendants in a bench trial, particularly in light of "the usual liberal approach to joinder to conserve judicial resources, reduce the chance of incongruous results in successive trials and to diminish the inconvenience to witnesses and all others concerned"); *State v. Salyers*, 3d Dist. Marion No. 9-05-07, 2005-Ohio-5038, ¶ 8-9 (trial court did not abuse its discretion in denying motion to sever where appellant and co-defendant were being tried on charges based on the same incident and appellant was unable to demonstrate

her rights were prejudiced by denial of the motion).  Barrett's second assignment of error is overruled.[1]

## IV. CONCLUSION

{¶69} For the foregoing reasons, Barrett's assignments of error are overruled.  Having found no error prejudicial to the appellant in the particulars assigned and argued, we affirm the judgment of the Logan County Court of Common Pleas.

*Judgment Affirmed*

**WALDICK and ZIMMERMAN, J.J., concur.**

**/hls**

---

[1] In response to this assignment of error, the State argues the juvenile court did not abuse its discretion in not severing the probable cause hearing into three separate hearings since Crim.R. 14—the rule upon which Barrett relies for his argument—only applies to *trials* and not preliminary hearings in juvenile court. Because Barrett has not met his burden to show that the trial court abused its discretion in not granting a severance, we need not decide this disputed issue.